## LEVER BROS. CO. v. BALTIMORE & O. R. CO.

### No. 5622.

Circuit Court of Appeals, Fourth Circuit.

Dec. 12, 1947.

John H. Skeen, of Baltimore, Md. (John H. Skeen, Jr., and Frank, Skeen & Oppenheimer, all of Baltimore, Md., on the brief), for appellant.

J. Sarsfield Sweeny and John S. Stanley, both of Baltimore, Md. (Hershey, Donaldson, Williams & Stanley of Baltimore, Md., on the brief), for appellee.

Before PARKER, SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

The subject matter of this suit is the loss of a carload of tallow belonging to the plaintiff which was received by the carrier from the consignor in good con-

dition at Wilmington, Delaware, but escaped through an outlet in the bottom of the car while it was en route to the plaintiff at Baltimore. The carrier undertook to account for the loss by producing evidence tending to show that the closing valve of the car, which was not furnished by it but by the shipper, was in a defective condition and that the tallow was not properly loaded before the car was turned over to the carrier. The District Judge who tried the case without a jury accepted this explanation and found a verdict for the defendant.

The car was placed by the plaintiff on the consignor's siding at Wilmington and the consignor caused the tallow to be pumped into the car in hot liquid form as it was brought in six truck loads from the consignor's plant a half mile away. The car consisted of a cylindrical steel tank placed horizontally on wheels. There was an opening in the top through which the car was filled, and which could be closed by a screw dome cap. There was also an opening in the bottom of the car through which it was emptied. This opening was provided with a valve that was controlled by a handle easily accessible to a person standing on the car's top. Below the outlet valve was a short outlet pipe to which a hose could be screwed as a conduit to receive the contents of the car. A threaded screw cap was provided for the outlet pipe and served to protect the threads at the end of the pipe and to retain the contents of the car even if the valve should not be closed. This cap was attached to the outlet pipe by a chain so that the cap would hang from the pipe when not in place.

After the car involved in this case was loaded, it remained in the custody of the carrier for five days in or near Wilmington without leakage or notice of defect. It was then hauled to Baltimore. When it reached a point ten or eleven miles from that city the conductor of the train noticed a streak of grease on the ties and when a point seven or eight miles from Baltimore was reached, the tallow was running at full force from the outlet pipe and substantially all of it was lost. The outlet cap was missing but was later found near the tracks twelve or thirteen miles from Baltimore. The chain by which it had been attached to the pipe had been broken.

These circumstances made out a prima facie case of negligence on the part of the carrier and placed the burden upon it to show that it was not responsible for the loss. To meet this burden the carrier showed that there had been no rough handling of the car and no accident. It also introduced evidence of an examination of the car on the day that the tallow was lost when it was discovered that the outlet valve could not be closed. About two weeks later, after the car had been taken for repairs to the shop of a subsidiary of its owner, the car was steamed out and entered by a workman who discovered a piece of wood 2x4x15 inches wedged in the valve in the bottom of the car so that it could not be closed. It was also found that the valve handle and the valve rod were stuck and that nuts on the rod were out of adjustment. The District Judge considered this evidence, together with other evidence relating to the loading of the car, and reached the conclusion that the defendant was entitled to a verdict under the rule that a carrier has no liability for loss resulting from the act of the shipper in furnishing a defective car or in loading a car in an improper manner. Ala. & V. R. Co. v. American Cotton Oil Co., 5 Cir., 249 F. 308; Blytheville Cotton Oil Co. v. Kurn, 6 Cir., 155 F.2d 467.

The evidence showed that the proper method of loading the car was to close the bottom valve and to remove the outlet cap during the loading so as to show whether the outlet valve was actually in the closed position. It was proved that the loading of the car was done by the chauffeur who drove the truck containing the tallow to the car. He was not produced as a witness because he could not be found. Only one witness, who described himself as general manager of the consignor, testified as to the loading. He did not take part in the loading but had an opportunity to see how it was done since he had occasion to pass the railroad siding on a number of occasions while driving another truck in transacting other business for the

consignor. He testified that he noticed the outlet cap on two occasions, once when it was off during the loading, and once when it was on after the loading had been finished. This testimony, however, was given by deposition nearly three years after the event; and the District Judge found that this witness did not carefully supervise or observe the loading of the car and therefore did not credit the testimony that the cap was off at any time during the loading. On the other hand, the Judge gave weight to the testimony of the defendant's investigators that the general manager told them that when a car was placed to receive the shipment, the shipper's employees assumed that it was in proper condition and did not examine it but merely unscrewed the dome cap and filled the car with the liquid tallow. Our examination of the testimony in the case fails to show that the District Judge was clearly wrong in his findings, but rather leads us to the conclusion that the car was in a defective condition when placed on the siding, and that the employee of the consignor did not test the value or remove the outlet cap before loading, and that the contents were not kept in the car by the closing of the valve but by the outlet cap, so that when it was dislodged during the journey, the loss occurred. It is a fair inference that if the outlet cap had been off during the loading, the tallow would have run out of the car because of the defective condition of the valve.

■ The plaintiff contends that the Judge was in error in admitting in evidence certain portions of the Consolidated Freight Classification No. 15 approved by the Interstate Commerce Commission wherein tallow is listed as one of the items covered and the shipper's duty to observe the carrier's rules for loading freight is set forth; and also in admitting in evidence Rule No. 34 of the Association of American Railroads relating to the loading of tank cars, wherein shippers are admonished that before a tank car is loaded, they must see that the safety and outlet valve and the closing of all openings and the protective covers of all appliances are in proper condition. The rule specifically provides that tank cars with bottom discharge outlets must have their outlet caps off during the entire time the cars are being loaded.

The objection seems to be directed to the point that the rules of the American Association of Railroads have not been approved by the Interstate Commerce Commission and are not binding on shippers. The argument, however, has no relevance in this case since the general manager of the shipper testified that he was familiar with the proper method of loading tank cars and that it was the duty of the shipper to close the outlet valve and remove the outlet cap before loading, and replace the outlet cap and the dome cap after loading. Since these precautions are so obviously a proper part of the loading operation when carefully performed, and are so freely admitted to be essential by the shipper, the technical point of evidence is not worthy of consideration.

■ The same comment may be fairly made with reference to the plaintiff's objection to the testimony of certain railroad men who said that the procedure for loading tank cars prescribed by the rule was the proper way and the one customarily observed in actual practice. The objection to this testimony seems to be that the evidence does not strictly conform to the requirements of the proof of a trade custom and that notice of the practice was not brought home to the shipper. The objection is without merit for the evidence was clearly admissible to show the standard of care exercised in the business which in this instance was approved by the plaintiff itself. See Wigmore on Evidence, 3d Ed., Vol. 2, p. 488, § 461; Pierson & Sons v. Gohr, 126 Md. 385, 395, 94 A. 1021.

Affirmed.